# CASES

## ARGUED AND DETERMINED

### IN THE

# Supreme Court of South Dakota

STATE, Respondent, v. EGAN, Appellant.

(195 N. W. 642.)

(File No. 5310.   Opinion filed October 26, 1923.)

**1. Criminal Law—Trial—Withdrawal of Plea of Not Guilty Discretionary.**

Permission to withdraw a plea of not guilty for the purpose of filing a dilatory plea is discretionary with the trial court, and when no substantial right of the defendant has been invaded by the refusal of such request the ruling of the trial court will not be disturbed on appeal.

**2. Indictment and Information — Demurrer — Conspiracy—Fraud—Objections Which Should Be Presented by Demurrer.**

Under Rev. Code 1919, Secs. 4771, 4779, objections that information for conspiracy to defraud insurance company charges more than one offense; that court is without jurisdiction; that insurance policy described is not a standard policy; that information does not allege a purpose to defraud the insurance company, and contains no allegation that any false proof of loss was presented, that no public offense can be predicated upon a statement of value in a standard policy—should be presented by demurrer and not by objections to evidence.

**3. Criminal Law—Trial—Evidence—Overruling Objections to Admission of Evidence Held Not Prejudicial.**

Overruling objections to the admission of evidence on the ground of defects in information not prejudicial, where, had all of such matters been presented on demurrer, a new information could have been filed, and a short delay in the trial would have been the only result.

**4. Insurance—Fraud—Indictment and Information—Information for Filing False Claim Held Sufficient.**

An information charging that accused presented a "false and fraudulent claim and proof in support of such claim and proof of loss," was sufficient as against an objection that it failed

1—Vol. 47, S. D.

to allege that accused presented a false or fraudulent "claim" against the insurance company under Rev. Code 1919, Sec. 4271; the statute being violated and the offense complete when a proof of loss is false or is made in furtherance of a fraudulent design or scheme to defraud.

5. **Indictment and Information—Information Sufficient, if Plain to Person of Common Understanding.**

An information is sufficient in law, where a person of common understanding would know what is intended.

6. **Insurance—Evidence—Fraud—Policies, Articles of Incorporation, and Certificates of Authority Held Admissible in Prosecution for Defrauding Insurance Company.**

In a prosecution for presenting false and fraudulent proofs in support of a claim for loss under a fire policy, the state was properly permitted to introduce in evidence certain policies, articles of incorporation, certificates of authority to do business of insurance companies other than the complainant insurance company, for the purpose of showing what the state claimed to be excessive insurance carried by accused and false representations made relative to value.

7. **Criminal Law — Trial — Evidence — Sufficient Foundation Held Laid for Admission of Applications for Insurance Signed by Accused.**

In prosecution for presenting fraudulent proofs in support of claim for fire loss, sufficient foundation for the admission in evidence of applications bearing the signature of accused was laid by testimony of a witness that he was present when the applications were prepared, and that certain of the matters in question had been inserted to accused's knowledge before they were signed; the claim of accused being that certain matters in the applications had been inserted without his knowledge after he signed.

8. **Insurance — Value — Evidence — Actual Value of Building Destroyed Admissible in Criminal Prosecution.**

Actual value of building destroyed by fire was admissible in a prosecution for presenting fraudulent proofs, notwithstanding Rev. Code 1919, Sec. 9201, providing that amount of insurance written shall be taken conclusively to be the true value of property wholly destroyed without criminal fault on the part of insured, it being claimed in the prosecution that the property was destroyed through the "criminal fault" of insured.

9. **Insurance—Fraud—Criminal Act to Knowingly Magnify Value of Destroyed Property in Proof of Loss.**

Under Rev. Code 1919, Sec. 4271, denouncing the offense of presenting false proofs of loss, it is a criminal act to knowingly greatly magnify the value of destroyed property in a proof of

loss, even though the insurance company would be bound by the amount stated in the policy in a civil action under section 9201.

10. **Criminal Law—Evidence—Sufficient Foundation Held Laid for Admission of Proof of Loss.**

In prosecution for presenting false and fraudulent proofs of loss, by fire, under Rev. Code 1919, Sec. 4271, evidence held to furnish sufficient foundation for inference that proof of loss was presented to the insurance company through its agent within the county of the prosecution, so as to render the proof of loss admissible in evidence.

11. **Insurance—Evidence—Evidence Held Sufficient to Show Preconceived Plan to Insure Property and Then to Burn It.**

In a prosecution for presenting false and fraudulent proofs in support of a claim for loss by fire, evidence held sufficient to support a finding that accused purchased the property in question pursuant to a preconceived plan to insure it for many times its value, and then burn it or cause it to be burned and collect the insurance.

12. **Insurance—Evidence—Value—Evidence Sufficient to Show Value Placed on Building False.**

In a prosecution for presenting false and fraudulent proofs in support of a claim for loss by fire, evidence held sufficient to sustain falsity of the value placed upon the property in the proof of loss.

13. **Criminal Law—Evidence—Other Fires Admissible to Prove Falsity of Statement in Proof of Loss.**

In a prosecution for presenting false and fraudulent proofs in support of a claim for loss by fire, evidence of the burning of other property of the accused was admissible for the purpose of proving the falsity of the statement in the proof of loss that the cause of fire was unknown.

14. **Criminal Law—Instructions—Trial — Court Rules — Objections Can Be Made to Instruction Before Given.**

If no objection is made to an instruction before it is given, the parties are deemed to have waived objection and consented that it be given, and a party cannot predicate error upon an instruction to the giving of which he has consented, and merely taking an exception to an instruction either before or after it has been given is not sufficient to authorize a review of the same on appeal, in view of trial courts rule 26.

15. **Criminal Law — Prosecuting Attorney — Trial — Argument of State's Attorney Held Not Prejudicial.**

An argument of state's attorney that everybody in the state knew that defendant was guilty held not prejudicial to accused.

**16.   Criminal Law—Prosecuting Attorney—Trial—Accused Protected from Improper Argument by Instruction.**

Rights of accused were protected from a remark of state's attorney in argument, that everybody in the state knew that he was guilty, by an instruction of the court that the jury should not be influenced by any statement of counsel not warranted and supported by the evidence.

**17.   Criminal Law—Trial—Jury—Affidavits—Affidavits of Jurors as to Misconduct Held Pure Fabrication.**

Affidavits of two jurors who voted for acquittal that they cut cards to determine whether they would vote guilty, held pure fabrication, in view of affidavits of the other jurors, and court did not err in refusing to grant new trial.

Dillon, J., dissenting.

Appeal from Circuit Court, Minnehaha County, Hon. James McNenny, Judge.

George W. Egan was convicted of presenting false and fraudulent proofs in support of a claim for loss under a contract of insurance, and, from the judgment of conviction and an order denying a new trial, appeals. Affirmed.

*Kirby, Kirby & Kirby,* of Sioux Falls, for Appellant.

*Geo. W. Egan,* of Sioux Falls, pro se.

*Buell F. Jones,* of Britton, Attorney General, and *Byron S. Payne,* of Pierre, for Respondent.

(1) to (5)   To points one to five of the opinion, Appellant cited: U. S. Rhodes, 30 Fed. 431; Stillman v. Eddy, 8 How. Prac. 122-123; U. S. v. Miskell, 15 Fed. 369; State v. Stevens, 16 S. D. 309; Miller v. Pedra, 21 Pac. 1021; State v. Suppe, 57 Pac. 106; People v. Morley, 95 Pac. 84; State v. Ruhnke, 7 N. W. 264; State v. Blakeley, 86 N. W. 420; Nasets v. State, 32 S. W. 699; Cowan v. State, 35 N. W. 408.

Respondent cited:   State v. Egan, 44 S. D. 273, 183 N. W. 652; Bishop's Criminal Procedure, Sec. 747; Wharton's Criminal Procedure, Sec. 1335; 16 C. J. Sec. 728; State v. Arbes, 70 Minn. 462, 73 N. W. 403; State v. Kelley, 25 N. D. 1, 140 N. W. 714; Rev. Code 1919, Sec. 4779; Bem v. Shoemaker, 10 S. D. 453, 74 N. W. 239; Manganese Steel Safe Co. v. First State Bank, 28 S. D. 426, 134 N. W. 886; Stenson v. Elfmann, 29 S. D. 59, 137 N. W. 283; Davis v. Davis, 29 S. D. 420, 137 N. W. 283; State v. Leavitt, 29 S. D. 20, 135 N. W. 757; Carlberg v. Fields, 33 S. D.

410, 146 N. W. 560; Lounsbury v. Kelley, 33 S. D. 410; Smith v. Retail Merchants Fire Ins. Co., 37 S. D. 395, 158 N. W. 780; Smith & Co. v. Kimball, 38 S. D. 511, 162 N. W. 162; Stimson v. Stimson, 30 N. D. 78, 152 N. W. 132; 4 C. J. 1108; 2 Enc. Pl. & Pr. 355; 2 R. C. L. Sec. 187; Rev. Code 1919, Sec. 4271; People v. Lauman (Cal.), 201 Pac. 459; State v. Korth, 38 S. D. 539, 162 N. W. 144; Johnson v. State, 65 Ind. 204; Com. v. Philipburg, 10 Mass. 78; Com. v. Deadham, 16 Mass. 141; Fisher v. State, 40 N. J. L. 169; People v. Jackson, 8 Barb. 637; Mc-Laughlin v. Com., 4 Rawle 464; People v. Spiegel, 38 N. E. 284, 26 N. Y. S. 1041; People v. Markheim, 147 N. Y. S. 1041; Marsh v. Benton County, 39 N. W. 713, 75 Iowa 596, 76 Conn. 118; Gordon Bros. v. Wageman, 108 N. W. 1067, 77 Neb. 185.

(6) to (8)   To points six to eight, Appellant cited: Lawver v. Globe Mutual Insurance Company, 127 N. W. 615; Rev. Code 1919, Sec. 1458; Home Insurance Co. v. Weed (Neb.), 75 N. W. 539; Barnard v. People's Fire Ins. Co., 29 Atl. 1033; Riley v. Franklin Ins. Co., 43 Wis. 449; Oklahoma Farmers Mutual Indemnity Assn. v. McCorkle, 97 Pac. 270; Springfield Fire & Marine Ins. Co. v. Homewood, 122 Pac. 196; State v. Fannon (Mo.), 59 S. W. 75.

Respondent cited: McCollum v. Fire Ins. Co., 67 Mo. App. 76; Citizens Mutual Fire Ins. Co. v. Conowingo Bridge Co., 77 Atl. 376; 19 Cyc. 850, 851; 13 Ency. of Law, Sec. Ed. 337.

(13)   To point thirteen, Appellant cited: Brock v. State, 26 Ala. 104; Commonwealth v. Gauvin (Mass.), 8 N. E. 895; State v. Raymond (N. J.), 21 Atl. 328; State v. Dukes (S. C.), 19 S. E. 134; People v. Fitzgerald, 50 N. E. 846.

(14)   To point fourteen, Respondent cited: State v. Korth, 38 S. D. 539, 162 N. W. 144; State v. Uren, 162 N. W. 745; Schmidt v. Carpenter, 27 S. D. 412, 131 N. W. 723; Ward v. Brown, 31 S. D. 296, 140 N. W. 698; Perreault v. Wis. Granite Co., 32 S. D. 275, 144 N. W. 110; Davis v. Davis, 36 S. D. 336, 154 N. W. 799; Lunden v. Railway Co., 31 S. D. 357, 141 N. W. 93.

(15)   To point fifteen, Respondent cited: People v. Roat (Mich.), 75 N. W. 91; State v. Guffey (S. D.), 163 N. W. 679; State v. Knudson (N. D.), 132 N. W. 149; State v. Julius, 29 S. D. 638, 137 N. W. 590.

(17) To point seventeen, Appellant cited: State v. English, 172 N. W. 116; Donner v. Palmer, 23 Calif. 40.

Respondent cited: State v. English, 41 S. D. 560, 172 N. W. 116; Hunt v. Elliott, 77 Cal. 588, 20 Pac. 132; State v. Andre, 14 S. D. 588, 84 N. W. 783; State v. McDonald, 16 S. D. 78, 91 N. W. 447; State v. Cray (N. D.), 153 N. W. 425.

POLLEY, J. This case was here on a former appeal. The judgment appealed from was reversed, and the case was sent back to the trial court for a new trial. 44 S. D. 273, 183 N. W. 652. The case was retried, and appellant was again convicted. From the judgment of conviction and from an order denying appellant a new trial, he brings the case here on a second appeal.

[1] At the commencement of the first trial appellant entered a plea of not guilty and proceeded with the trial. At the beginning of the second trial he asked permission to withdraw his plea of not guilty, in order that he might interpose a demurrer to the information. This request was denied, and error is assigned. Permission to withdraw a plea of not guilty for the purposes of filing a dilatory plea is discretionary with the trial court, and when no substantial right of the defendant has been invaded by the refusal of such request the ruling of the trial court will not be disturbed on appeal. 16 C. J. 396.

Some of the matters that were presented and disposed of by this court on the first appeal are again presented and reargued on this appeal. Such matters have been given consideration by the court, but after such consideration we are satisfied with the conclusion reached on the first appeal, and as to such matters no further reference will be made.

The information, in substance, charges: That on the 6th day of September, 1919, the Firemen's Insurance Company of Newark, N. J., issued to appellant a policy, being a standard South Dakota policy, by the terms of which a certain 2½-story frame building situated on a certain described tract of land in Minnehaha county was insured in the sum of $2,500, for the term of one year from the date of said policy. That within the said term, to wit, on the 24th day of November, 1919, the said building was totally destroyed by fire. That during the time covered by said policy of insurance, and prior to the destruction of said building, appellant had secured policies of insurance, insuring said property

"against like loss or damage by fire," aggregating the sum of $27,500. That on or about the 9th day of January, 1920, appellant made out and presented to said Firemen's Insurance Company, through its agent at Sioux Falls, a proof of loss whereby appellant claimed and represented that the cause of the fire that destroyed the said building "was unknown; that the said building was occupied as a residence and summer home; that the value of the said building was $30,000; that said fire did not originate by any act or design or procurement on the part of the said George W. Egan, or in consequence of any fraud or evil practice done, or suffered to be done, by said assured; that nothing had been done by or with the said George W. Egan's privity or consent to violate the conditions of said policy of insurance theretofore issued by the Firemen's Insurance Company, or to render said policy void."

It is then alleged that the above statements set out in said proof of loss were false and fraudulent and were known to be false and fraudulent by the said defendant when they were made, in that the said building had not been totally destroyed, for that the basement and foundations remained intact; that the cause of the said fire was at the time known to the said George W. Egan, and that he himself had caused the said fire to be started for the purpose of destroying the said building; that the said building had not been occupied by the said George W. Egan as a residence or summer home, nor had it been occupied as a home or summer residence by any one during the time said insurance was in force, but that it had been used as a dancing pavilion and place for the storage of household goods; that the said building was not worth $30,000, as claimed and represented by appellant, but was of the value of approximately $2,000; that the said fire and destruction of the said building was procured by the said George W. Egan with the fraudulent intent of collecting money from said insurance companies greatly in excess of the value of the said building.

Appellant contends that the trial court erred to his prejudice in the admission of any evidence, on the grounds that the information does not conform to the provisions of section 4771, R. C.; that the information charges more than one offense; that the information does not describe a public offense; that no venue is laid, and that the court is without jurisdiction in the case; that

the information does not state facts sufficient to constitute a public offense; that the insurance policy described in the information is not a standard policy under the law of this state; that the information does not allege a purpose to defraud the insurance company therein described; that the information contains no allegations that any false proof of loss was presented to the said insurance company, or to any person or agent of said company; that no public offense can be predicated upon a statement of value in a standard policy because the policy itself fixes the value.

[2, 3] No error was committed by the trial court in overruling the above objections. In the first place, with the exception of the question of venue, which was disposed of on the first appeal, and the question whether the information describes a public offense, these are all questions that should have been presented by demurrer (section 4771, R. C.), and under the provisions of section 4779 can be presented only on demurrer. In the second place, we have examined all of these questions and fail to find that appellant was in any manner prejudiced by the rulings complained of. Had all of these matters been presented on demurrer and had such demurrer been sustained, a new information could have been filed and a short delay in the trial would have been the only result.

[4, 5] It is contended by appellant that the information fails to describe a public offense, for the reason, among others, that it fails to allege that appellant presented a false or fraudulent claim against the said insurance company, but alleges only that he presented a false and fraudulent proof of loss. The language of the information is that appellant presented a false and fraudulent claim and proof in support of such claim and proof of loss. The information is drawn under the provision of section 4271. This section, so far as material, reads as follows:

"*False Proofs of Loss in Insurance.* Every person who presents or causes to be presented any false or fraudulent claim or proof in support of any such claim, upon any contract of insurance," etc.

In view of this statute, appellant's contention on this point is specious to say the least. The information very closely follows the language of the statute. It is the making of a false or fraudulent claim for a loss covered by the policy that constitutes the

gist of the offense, and it is provided by the policy itself that claims for loss shall be made by presenting a proof of loss. And when the proof of loss is false or is made in furtherance of a fraudulent design or scheme to defraud an insurance company, the provisions of the statute are violated, and the offense is complete. This is the construction that has been put upon this section in New York (People v. Markheim, 162 App. Div. 859, 148 N. Y. Supp. 155), where such statute has been in force since 1865. Section 644, N. Y. Pen. C. 1865; section 1202, Gilbert's Crim. Code N. Y. 1922. It is not contended by appellant that the information is not sufficiently specific so that a person of common understanding would know what is intended, and if it can be so understood then it is sufficient in law. Sections 4725, 4726, R. C.; State v. Morse, 35 S. D. 18, 150 N. W. 293, Ann. Cas. 1918C, 570; People v. Lauman, 187 Cal. 214, 201 Pac. 459.

[6]   At the trial the state introduced in evidence certain policies, articles of incorporation, and certificates of authority to do business of insurance companies other than the Firemen's Insurance Company, and the admission of these exhibits is assigned as error. These exhibits were introduced for the purpose of showing what the state claimed to be excessive insurance carried by the appellant on the building involved and the false representations made by the appellant relative to the value of said building. Upon this theory and for this purpose these exhibits were competent to go to the jury.

[7]   Error is assigned upon the admission in evidence of two exhibits designated as Exhibits 32 and 33. These exhibits are written applications, made after the policy described in the information had been issued, for additional insurance on the building involved. It is claimed by the state that these applications contained certain matters of fact that were false and misleading. These applications bore the signature of appellant. He claimed, however, that the matter claimed by the state to be material had been inserted by other parties after he had signed them and without his knowledge or authority, and for that reason they were incompetent and not binding on him. A witness on behalf of the state testified that he was present when these applications were prepared, and that certain of the matters in question which he specified had been inserted—and to appellant's knowledge—before

they were signed. This was a sufficient foundation for the admission of these exhibits.

[8, 9] Over objection by appellant the trial court admitted evidence to show the actual value of the building destroyed. The policy involved is a standard South Dakota policy, and contains the provision that:

"Except in case of buildings, where the amount insured upon the property shall be taken conclusively to be the true value thereof, as provided by section 9201, this company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs. * * * "

And section 9201 provides:

"Whenever a policy of insurance shall be written or renewed to insure any real property in this state, including structures on land owned by another than the insured against loss by fire, tornado or lightning, and the property insured shall be wholly destroyed, without criminal fault on the part of the insured or his assigns, the amount of insurance written in such policy shall be taken conclusively to be the true value of the property insured, and the true amount of loss and measure of damages; and the court, upon rendering judgment against the insurance company upon any such policy of insurance, shall allow the plaintiff a reasonable attorney fee, to be taxed as a part of the cost."

It is contended by appellant that because of this statute the value of the property is conclusively fixed at the amount named in the policy, and that it is not competent to show that the value is different from that fixed by the policy. With this contention we do not agree. However controlling this section may be in a civil action to recover on a policy of fire insurance, it has no application in a case like this; for here it is claimed that the property was destroyed through the "criminal fault" of appellant, and it is so alleged in the information. Furthermore it is a criminal act to knowingly greatly magnify the value of destroyed property in a proof of loss, even though the insurance company would be bound by the amount stated in the policy in a civil action.

[10] It is contended by appellant that the court erred in admitting in evidence the proof of loss set out in the information. In support of this contention it is claimed by appellant that there is no evidence to show he ever presented, either in person,

or through the mail, or otherwise, the said proof of loss to the Firemen's Insurance Company. That appellant went to the office of F. C. Whitehouse & Co. in Sioux Falls, local agents for said insurance company, and made out and signed and verified the said proof of loss before said Whitehouse on the 9th day of January, 1920, is admitted by appellant; but he claims that he did not leave it at said office at that time, and it next appeared in the office of the said insurance company in Chicago; but through just what channel it found its way to that office is not made clear by the evidence and because of this fact appellant claims that the evidence does not show that the proof of loss was presented in Minnehaha county, and that for that reason the evidence does not show that the crime, if there was a crime, was committed in said county. But the record does not support this position. We have the appellant's written and signed declaration that he did present said proof of loss to the agent of the said insurance company in Sioux Falls. On the 10th day of January, the day following the day on which appellant made out the said proof of loss, appellant wrote the following letter addressed to

"Firemen's Insurance Company, F. C. Whitehouse & Co., Sioux Falls, S. D. I am handing you herewith a more elaborate and specific proof of loss, estimate of cost of rebuilding, and general information so far as I am able to give it, in connection with the destruction by fire of my building on which you held insurance, November 24th, 1919."

This letter containing the "more elaborate and specific proof of loss" was mailed to and received by said insurance agency in Sioux Falls. This letter uncontradicted was sufficient foundation for the inference that the proof of loss was presented to said insurance company through its agent in Sioux Falls, Minnehaha county.

[11] Appellant urges the insufficiency of the evidence to support the verdict. Upon this question the evidence shows that the building involved had been built for a hotel or boarding house some 30 odd years ago. It does not appear to have been a paying venture. It changed hands several times. Some years prior to its destruction it was changed into a dance hall, and a large dancing pavilion was attched to one side of the original building. How long the place was used as a dance hall does not appear, but

the evidence indicates that it had not been used for this purpose for some time prior to the time of its destruction. Appellant acquired title to the property about the 6th day of September, 1919. At that time it was in a run-down and dilapidated condition. The two upper floors were not used for any purpose. The plaster was off the walls in places. Part of the doors and windows were broken. For some six months prior to the middle of October, 1919, the lower floor had been occupied by one Nash and family.

Appellant paid approximately $7,000 for the property, but this included 12½ acres of land, the value of which was fixed by appellant at $400 per acre. This would amount to $5,000, as the cost of the land, leaving about $2,000 as the cost of the building. It had changed hands several times within a year or two last past, but the purchase price at no time exceeded that paid by appellant. It does not appear that the building was insured against loss by fire when appellant purchased it, nor does it appear to ever have been suggested that it was in danger from fire. But almost immediately after appellant acquired the property he began taking out fire insurance policies in various amounts from different insurance companies, until at the time of its destruction on the 24th day of November, 1919, he had it insured for a total of $27,500. In applying for the various policies appellant represented the building to be worth $30,000.

It is claimed by the state that appellant purchased this property with the intent and for the purpose of insuring it in an amount greatly in excess of its actual value, then burning it down and collecting the insurance. That the destruction of the building by fire was in his mind is evidenced by the frequency with which he mentioned the matter of fire to others. Nash, who lived in the house when appellant purchased it, moved out about the middle of October, but left some of his goods in the building. Appellant thereupon wrote Nash that he (appellant) would not be responsible for the destruction by fire of the goods Nash had left in the house. When Nash moved out of the house one George Henderson moved in. Appellant employed Henderson to tear down and remove the dancing pavilion. Appellant also had a portion of the heating and plumbing material taken out of the house and moved away. The value of the material saved in this way was $500 to $700. Henderson testified that appellant spoke to him about fire

several times; that he told Henderson not to leave the house a single night without letting him (appellant) know about it; that on another occasion appellant asked him to go out to a farm near Colton and stay all night; that when Henderson commenced to wreck the dance pavilion appellant suggested that he pile the lumber outside; that he would not like to pile it inside on account of the danger of fire. Henderson testified that he spoke to appellant about buying the dance hall and that appellant said he would not be responsible in case of fire; that he (Henderson) ought to take out some insurance on the personal property he had in the building; that he (appellant) had taken out $750 insurance on the contents of the building, and that he meant some of it to cover Henderson's property.

On the 23d day of November appellant went to Henderson and informed him that he wished to know the value of a piece of land in Buffalo county; that he must know immediately, and requested Henderson to go to Buffalo county and examine the land and report to appellant by telegraph. Henderson was not a real estate man and was not familiar with land values, but he did as appellant requested. He went to Buffalo county, found and examined the land and reported to appellant as directed. From there he went directly to some place in Minnesota and spent Thanksgiving Day with his wife's folks. On the 24th day of November, appellant had or pretended to have urgent business in Sioux City and departed for that place. This left the building in question wholly deserted for the time being, and that night it burned to the ground. That the fire was of incendiary origin there is no possible doubt and it is the theory of the state that the fire was started by some person employed by appellant for that purpose.

Henderson testified that shortly after the fire he had a talk with appellant, in the course of which appellant said he meant that $250 of the insurance he carried should be on witness' property. Henderson also testified that he talked with appellant about his (witness') policy; that on another occasion appellant showed Henderson his policies and said: "George, we have won the game, I have paid my premiums and now, by God, I want my money; by God they have got to pay me." This witness testified to other occasions when appellant talked about the possibility of the build-

ing burning. He said that he cooked his breakfast in the house about 9 o'clock on the morning of November 23d, that he was in the house again just before he started for Buffalo county about 4 o'clock that afternoon, and that there was no fire in any stove in the building at that time. There was evidence, competent to go to the jury, to the effect that appellant visited the building in company with a stranger who has not since been seen in the vicinity—and whose absence has not been accounted for. On the night of the fire and just prior to the discovery of the fire an automobile was seen to drive along the road leading past the building. A short distance beyond the building this automobile stopped. The lights were turned off and the car remained there about half an hour, when the lights were turned on and the automobile driven away. Very shortly after the automobile left the fire was discovered. It was shown that other buildings owned by appellant, or in which he was interested, had burned, or had been damaged by fire, and that he had collected insurance money for such damage. One of these buildings was a large barn in the vicinity of the building involved in this case. It was burned about three months prior to the fire in question. The origin of the fire was unknown, but according to the evidence on behalf of the state the building was insured for an amount greatly in excess of its value, which insurance was paid to appellant. These are the principal circumstances in support of the theory of the state, but there are many minor circumstances that indicate that appellant purchased the property in question pursuant to a preconceived plan to insure it for many times its value, then to burn it or cause it to be burned and collect the insurance. The evidence is abundantly sufficient to support such theory.

[12] But even if the evidence were not sufficient to show that appellant was instrumental in the burning of the building, yet it is entirely sufficient to sustain the falsity of the value placed upon the property in the proof of loss.

[13] It is contended by appellant that the trial court erred to his prejudice in admitting evidence of the burning of the barn above mentioned, and the collection by appellant of the insurance for the loss thereof. As a general rule it is not competent on a trial for one offense to admit evidence of other offenses, but there are exceptions to this rule, and it is competent on questions of

intent or motive to admit evidence of other offenses. People v. Panagoit, 25 Cal. App. 158, 143 Pac. 70. In the absence of evidence showing · the origin of the fire it is presumed to have been the result of accidental causes. But this presumption is materially weakened where the same person has a second fire a short time after the first, and especially is this true where the property is heavily insured in both instances and neither of the fires can be accounted for except on the ground of incendiarism. Again, this is not a prosecution for arson, and the evidence tend· ing to prove arson was admitted only for the purpose of proving the falsity of the statement in the proof of loss that the cause of the fire was unknown. Underhill Cr. Ev. § 153; Wigmore's Ev. §§ 303-340-354. The evidence complained of is relevant to the issue, and it should not be held to be incompetent merely because it tends to prove some other independent offense by appellant. Underhill, Cr. Ev. § 154.

Complaint is made by appellant that the court erred to appellant's prejudice in the giving of certain instructions to the jury, and in the refusal to give other instructions requested by him. The instructions have been carefully gone over. The requested instructions are not such as should be given to a jury in any case where there is any question to go to the jury, and were properly refused.

[14] The only instruction given that merits consideration is one that left the jury to find whether the burned building was occupied as a dwelling at the time of its destruction. It is contended by appellant that this issue should not have been submitted to the jury. But if appellant was of the opinion that this issue should not have gone to the jury he should have made his objection before the instruction was given. Trial court's rule 26 requires that all instructions be reduced to writing and submitted to the parties to the action before given. If any instruction is objectionable to either party, such objection shall be stated and the reason therefor given.

"Each counsel, or party, shall specify and state the particular ground or grounds upon which the giving or rejection of any instruction is objected to. It shall be insufficient to state generally that an instruction does or does not state the law, but it shall be necessary to specify clearly wherein any instruction, or part there· of objected to, is insufficient or does not state the law."

If no objection is made to an instruction before it is given the parties are deemed to have waived objection and consented that it be given, and a party cannot predicate error upon an instruction, to the giving of which he has consented. Merely taking an exception to an instruction either before or after it has been given is not sufficient to authorize this court to review the same on appeal.

[15, 16] Appellant contends that there was misconduct on the part of the state's attorney in his closing argument to the jury and that such misconduct was prejudicial to appellant's rights. This contention is based on the following statement alleged to have been made to the jury by the state's attorney:

"Everybody in the state of South Dakota knows that defendant is guilty; he is guilty. It isn't a question of his guilt, but a question of whether he can be convicted or not."

It does not appear that this remark was called to the attention of the court when it was made, if it was made, nor that the court was asked to admonish the jury to disregard it, nor that it was called to the attention of the court at all. The state's attorney made and filed an affidavit in which he positively denies having made the statement, as set out by appellant, and says that the statement that he made was different and has a different meaning than the statement set out by appellant. While the state's attorney may have gone beyond the limit of strict propriety, we do not believe the appellant was prejudiced by what was said or that appellant believed at the time that he was being prejudiced, or he would have called the matter to the attention of the court at the time. But in any event the rights of appellant were protected by an instruction given by the court. Upon this point the court charged the jury as follows:

"I further caution you, gentlemen of the jury, that you should not give heed to, or be influenced by or pay an attention to any statement of counsel or arguments by them which is not warranted and supported by the evidence or fair inferences drawn therefrom."

This case is not at all parallel to State v. Vroman (S. D.), 188 N. W. 746, cited by appellant.

[17] Appellant contends that he is entitled to a new trial of this case because of misconduct of certain of the jurors who

tried the case. This contention is based on affidavits of two members of the said jury, Walters and Aasen by name. In their affidavits these jurors state that the case was finally submitted to the jury on the 15th day of April, 1922; that during the afternoon and evening of that day the evidence in the case was discussed by the jurors and several ballots taken; that Walters and Aasen believed the defendant to be innocent of the charge against him and voted not guilty; that up to 9 or 10 o'clock in the evening no verdict had been reached; that they were tired of serving on the jury and desirous of finishing the case that they might be discharged and go to their homes; that they then entered into an agreement between themselves that they would determine what their verdict should be by cutting a deck of cards; that both would cut and if Aasen cut the high card their verdict should be "guilty"; but if Walters cut the high card their verdict should be "not guilty"; that they then went "apart" from the other jurors and Walters took a deck of cards from his pocket; that they both cut; that Aasen cut a queen and Walters cut a nine spot; that according to their agreement their verdict must be "guilty"; and that pursuant to such agreement they voted guilty when the next ballot was taken.

So far as the printed record prepared and sent here by the appellant is concerned these affidavits are uncontradicted and the matters therein set out stand as admitted facts. But such in reality is not the case. All, or all but one, of the other jurors made affidavits to the effect that so far as they knew none of the acts described by Walters and Aasen ever took place; that during the time the evidence was being discussed by the jury Walters and Aasen mingled with the other jurors and took part in such discussion as freely as the other jurors; that said Walters and Aasen were not at any time by themselves, either in the toilet or at any other place; but that they were at all times within hearing of the other jurors, and that to the best of their knowledge nothing was said by said Walters or Aasen relative to cutting cards.

It may be possible, though we do not believe it to be possible, that these two jurors could have done what they say they did without some of the other jurors seeing them or knowing what they were doing, and on more mature consideration this seems to have been the opinion reached by Walters and Aasen themselves,

2—Vol. 47, S. D.

for something over a month after making these affidavits they made another affidavit very similar to the first, except that instead of going "apart" from the other jurors they went into the toilet where no other person could see what they did. Had they gone into the toilet as they now say they did, it is not at all likely that they, or appellant, would have overlooked the fact when the first affidavits were prepared.

Another circumstance that renders the truth of these affidavits highly improbable is the following: These jurors state in their affidavits that they told certain parties on the following day how they had arrived at their verdict and that the defendant himself knew it within a very few days. Defendant knew that if what these parties said about the verdict was true it was of the utmost importance on his motion for a new trial, and as an experienced lawyer he knew how vital it was to him to secure the proof of such fact at the very earliest moment possible, and before any possible misadventure might prevent the securing of such proof. Yet five months were allowed to elapse after the rendition of the verdict before any affidavit was secured. From the standpoint of a lawyer such delay in a matter of such vital importance is not conceivable. The matter was submitted to the trial court on the motion for a new trial as a question of fact, but the trial court was evidently of the opinion, as all of the members of this court, with one exception, certainly are, that the matter contained in these affidavits relative to misconduct of the jury is a pure fabrication and upon that ground the motion was properly denied. In thus disposing of this question we assume, but do not decide, that the affidavits of Walters and Aasen were competent to impeach the verdict.

While all of appellant's assignments have not been discussed in this opinion, all have been considered, and after such consideration we are satisfied that appellant has had a fair trial, and that no prejudicial error is disclosed by the record.

The judgment and order appealed from are affirmed.

DILLON, J. (dissenting). I cannot agree with my brother POLLEY that the judgment of conviction should be affirmed. For numerous prejudicial errors in this record, this case should be reversed.

While the defendant had an interest in the barn that burned

on Labor Day, 1919, there was not the slightest evidence that the barn was burned by any act or procurement of the defendant. There is not a syllable of testimony tending to show any willful act of any person criminally responsible for the burning of the barn or any evidence, even remotely, to exclude the presumption of loss by natural or accidental causes.

Elsa Cromm and Louis Cromm testified about the burning of the barn on Labor Day, 1919, over defendant's objection.

J. L. Stowe was permitted to give an opinion on the reasonable value of the barn, and he was permitted, over defendant's objection, to give the price he had paid for this property and the price that he had sold it. This evidence was not connected with the building now in suit.

. It must be shown that the setting of the fire was a felonious act to overcome the presumption of innocence. There is no justification in permitting proof of the value of the barn; such evidence was wholly collateral. It is self-evident that this proof of the burning of the barn and the value of the barn was a prejudicial error.

In an indictment for arson, after the corpus delicti is established and it is shown that the building was burned with criminal intent, then it is admissible to introduce a motive as a circumstance tending to connect the defendant with the commission of the offense. If the defendant could not be convicted for arson on this evidence, he could not be convicted for making a false proof or in denying his knowledge of the arson. There is absolutely no evidence in the record to establish the corpus delicti and without such proof under the decision of this court, a conviction cannot be sustained.

"In a prosecution for the crime of arson, the corpus delicti— that is, that the crime charged has been committed by someone— consists of two elements: (1) That the building in question burned; and (2) that it burned as the result of the willful and criminal act of some person. 'It is now universally recognized * * * that proof of the single fact that a building has been burned does not show the corpus delicti on arson, but it must also appear that the burning was by a willful act of some person criminally responsible, and not as the result of natural or accidental causes, for when a house burned, and nothing appears but that

fact, the law rather implies that the fire was the result of accident or some providential cause other than of criminal design.'" State v. Elwell, 105 Or. 282, 209 Pac. 616, 2 R. C. L. 514.

"The presumption is that a fire resulted from natural or accidental causes; also the defendant is presumed to be innocent."

Kinsey v. State, 12 Ga. App. 422, 77 S. E. 369. It is said, where the evidence does not overcome the legal presumption that the burning was accidental, a conviction of arson was unauthorized.

Moon v. State, 12 Ga. App. 614, 77 S. E. 1088. Mere proof that a barn was consumed by fire does not tend to show that the fire was a felonious one, presumption being that it was an accident. Proof of corpus delicti in arson requires proof not only that the building burned, but that the fire originated through a criminal agency.

"The proof of the charge in criminal causes involves the proof of two distinct propositions: First, that the act itself was done, and second, that it was done by the person charged and none other: In other words, proof of corpus delicti, and of the identity of the prisoner." 2 R. C. L. 514; Spears v. State, 92 Miss. 166, 46 South. 166; 16 L. R. A. (N. S.) 285; State v. Plienick, 46 Wash. 523, 90 Pac. 645, 11 L. R. A. (N.S.) 987, 13 Ann. Cas. 800; Bines v. State, 118 Ga. 320, 45 S. E. 376; People v. Simons, 25 Cal. App. 723, 145 Pac. 145; State v. Wilkins, 158 N. C. 603, 73 S. E. 992; State v. Hauser (S. D.), 191 N. W. 446; Overstreet v. State, 46 Ala. 30; Lane v. Commonwealth, 134 Ky. 519, 121 S. W. 486; State v. Cristani, 192 Iowa 615, 185 N. W. 111.

In People v. Henry, 129 Mich. 100, 88 N. W. 77, a case where defendant was charged with breaking and entering a saloon with the intention of committing larceny. Defense was that he was too intoxicated to form an intent to commit larceny. The people were permitted to show his conviction of larceny on two former occasions. It was held that such testimony was improperly received; Mr. Justice Grant, who wrote for the court, saying:

"A felonious intent is an essential ingredient in the crime of larceny. It is, in fact, the gist of the offense. This is a clear case of introducing evidence of one crime to prove the commission of another. It is within the rule of People v. Jacks, 76 Mich.

218, 42 N. W. 1134; Lightfoot v. People, 16 Mich. 507; People v. Lonsdale, 122 Mich. 388, 81 N. W. 277; State v. Johnson, 38 La. Ann. 686; People v. Barnes, 48 Cal. 551; People v. Ascher, 126 Mich. 637, 86 N. W. 140."

Again in People v. Burke, 157 Mich. 108, 121 N. W. 282, a bank robbery case; it was there said by Mr. Justice Ostrander, speaking for the court:

"It was  *  *  *  an attempt to prove a distinct and remote crime, in no way related to the one for which respondents were being tried. If the record of the former conviction had been produced, it should not have been admitted in evidence. In numerous cases this court has had occasion to state and apply what is sometimes said to be an exception to the general rule that proof of the commission of other crimes may not be given upon the trial of one accused of crime. They are for the most part cases where the act of the accused was, in itself, innocent, involving no necessary implication of crime, or cases where the circumstances permitted the inference of accident, mistake, or inadvertence to be drawn."

In the case at bar, no pretext was made that the burning of the building was caused by incendiary acts.

The evidence as to the burning of the building is consistent with the innocence of the defendant, and nobody has been charged with unlawful act of burning the building.

It appears that the building burned to the ground and was a total loss. There was nothing left of the structure except the basement excavation and a part of the stone foundation below the ground. This constitutes a total loss under section 9201, Rev. Code 1919. Springfield Fire Insurance Co. v. Homewood, 32 Okl. 521, 122 Pac. 196; Palitine Insurance Co. v. Weiss, 109 Ky. 464, 59 S. W. 509.

This policy was written September 6, 1919. One Floyd Nash was then living in the building with his family. It appears that he continued to live in the building until the 17th day of October, 1919. When the Nash family moved out Henderson moved in. His wife stayed there with him one night but he stayed in the building every night from October 17th until the night before the fire. He had no other home or place to live, this was his residence, he slept there and got part of his meals there, and had all

of his furniture there. This testimony is undisputed in this record.

This policy contained a vacancy permit, viz.: "Permission is hereby granted for the within described premises to be and remain vacant for a period not exceeding sixty days at any one time;" the term "vacant" being construed to mean an empty building, devoid of personal habitation; "or to be and remain unoccupied for a period not exceeding six months at any one time;" the term "unoccupied" being construed to mean a dwelling that is entirely furnished but with habitant temporarily absent.

Under these definitions in the policy and the undisputed evidence, it should be held that the premises were occupied at the date of the fire. This issue should have been withdrawn from the jury.

It appears from the evidence of the contractors, that the foundation was constructed of Sioux Falls granite; that the halls were in good general repair. Some of the rooms had cement floors. All the woodwork and the stairway, which was about 7 feet wide, the plastering on the second floor and the doors, were in good condition. The rooms were all in good general repair. There was some plastering off in two rooms on the third floor, not very much.

W. A. Snitkey, general contractor, valued the property in the neighborhood of $30,000 or perhaps more. George Hughill, expert contractor, gave testimony that the value would be from $32,000 to $35,000. Albert McWayne testified that it would cost between $28,000 and $30,000. Robert Perkins testified that it would cost $30,000 according to his best judgment to replace the building. Joseph Schwartz testified the value of the building was $27,000 or $28,000. R. C. Hilchert, contractor, testified that he would figure the building to be worth about $32,000 where there was a total loss.

Under the Valued Policy Law (Rev. Code 1919, § 9201) the replacement value is fixed as the amount of insurance. Hence in case of any dispute upon the question of value, it should be the replacement value. Still the court permitted the prosecution to offer evidence as to the "cash value," the "market value," "the reasonable value," "the reasonable market value."

This evidence was all received over defendant's objection,

and constituted an error, as such different values would necessarily mislead the jury. Values were agreed upon by the companies and defendant. The defendant certainly had the right to rely upon these values when they had been deliberately agreed upon.

When the state failed to prove the criminal act of burning, the measure of damages became the amount fixed in the policy; especially is this true when no premium had been returned. It was the right of these companies to cancel these policies at any time, which they failed to do. Or if a fraud had been perpetrated, they could have rescinded the contract of insurance. The court should have specifically instructed the jury in reference to replacement values. The failure to do so constitutes a prejudicial error.

Under the Valued Policy Law the amount fixed in the policy is not subject to dispute. The sum fixed established the true amount that the company must pay.

In this court (Lawver v. Globe Insurance Co., 25 S. D. 549, 127 N. W. 615) it is said:

"Under this provision of the statutory policy not only is the true value of the insured real property conclusively fixed, but by it the absolute liability of the insurer to pay a fixed sum is also conclusively established. The true value of the property destroyed and the amount of the loss and measure of damages being conclusively fixed by the law and the contract evidence as to the value of the property destroyed or as to the loss sustained or the measure of damages becomes wholly immaterial and incompetent for any purpose." Home Insurance Co. v. Weed, 55 Neb. 146, 75 N. W. 539; Barnard v. People's Fire Insurance Co., 66 N. H. 401, 29 Atl. 1033; Reilly v. Franklin Insurance Co., 43 Wis. 449, 28 Am. Rep. 552; Oklahoma Farmers' Mutual Indemnity Ass'n v. McCorkle, 21 Okl. 606, 97 Pac. 270; Springfield Fire & Marine Insurance Co. v. Homewood, 32 Okl. 521, 122 Pac. 196, 39 L. R. A. (N. S.) 1182.

Section 9201 of the Rev. Code 1919 states:

"Whenever * * * the property insured shall be wholly destroyed, without criminal fault on the part of the insured or his assigns, the amount of insurance written in such policy shall be taken conclusively to be the true value of the property insured, and the true amount of loss and measure of damages."

"There will be no end to prosecutions   *   *   *   if every man is to be indicted because he places a higher valuation on his property than some neighbor may put on it." State v. Fannon, 158 Mo. 149, 59 S. W. 75.

W. L. Sloan, chief of police, testified:

"I know about the fire that occurred on Labor Day, 1919; of the Al Fresco fire; of a house on Fifth and Spring streets; of a fire on North Phillips Avenue. I made an investigation relative to the barn that burned on Labor Day, as to how much insurance was carried. There was $8,500 worth of insurance. In regard to the fire at Fifth and Spring streets in one of Egan's houses, I found some polishing materials and oil and cloths by the side of the stairway, like they had been wiping up. The fire was put out. It started in the stairway and burned out to the back door. My conclusion was that the fire was from spontaneous combustion from the paint and oils. The fire on Phillips avenue was caused by a chimney from an adjoining building."

Mattie Lorenzen and John Lorenzen, on the evening before the fire, between 8 and 9 o'clock, saw an automobile that stopped by their house one quarter of a mile away from the Al Fresco building, and remain there for one-half hour and then it went back towards town. They saw no one near the car or no one leave it. .

Charles Davis, on the 24th day of November, saw three teams with hayracks and farm wagons drive towards the park.

Ed. Martly was permitted to testify that Egan told him that he (Egan) had his barn well insured. It is difficult to comprehend the relevancy of this class of testimony.

It is claimed that defendant asked Henderson if he could go out and stay all night with the boys at the farm near Colton (the farm sold to Egan), but it appears that the man living there was making complaint about repairs, which was the cause of his visit.

Henderson, speaking of Egan, said: "If he (Egan) does not pay me, I will send him to the penitentiary." Still, on cross-examination, he testified that Egan never made any statement that made him suspicious. He also testified that defendant told him that if the maple flooring was put on the inside he (Egan) would not be able to recover the insurance. The maple flooring was, however, placed on the inside of the building. Much is said about

the hauling of straw to bank up the building, but it appears from the testimony that the straw to bank up the building remained undisturbed, and that the straw was old and well rotted straw. All of these incidents were wholly immaterial and should have been excluded from the jury. The jury should not have been permitted to speculate or conjecture upon these collateral matters.

Egan made a trip on Sunday to the dwelling, but in making this trip there is not even a suspicion in the conduct of the defendant. He went to see Henderson in order to get him to make an investigation of land in Brule county.

The record disclosed that both Henderson and Pierson were in the employment of the defendant; that, on Sunday morning before the fire, defendant received a decree in the McDonald case, which gave defendant only five days in which to pay $3,000. This decree provided that unless the payment was made within five days that the execution would issue. The land consisted of one-half section in Brule county. Defendant had not seen this land. It was important to determine whether to appeal from the decree or to pay the debt and keep the land. Hence the necessity of quick action. It was on the suggestion of Mr. Pierson that Henderson should go and make the investigation and report to defendant by telegram. There is no suspicious circumstance in the going of Henderson on Sunday to inspect this land. On the receipt of the telegram, the appeal was taken. And here an innocent act is sought to be changed into a criminal one.

It appears that Egan did not know that it was necessary for him to go to Sioux City as a witness until he received a telegram from his attorneys that he must come. It is not disputed that Egan was in Sioux City at the time of the fire.

The nine policies were all issued under the Valued Policy Law and nearly all contained the clause, "other concurrent insurance herewith permitted." The insurance companies thus invited the defendant to take out all the insurance that he wanted, without limit. The defendant wanted enough insurance to cover the value of his building, because it was outside of the fire limits. There was no fraud in the issuing of the policies because the companies agreed upon the values.

The court submitted three issues to the jury, viz.: First, did the defendant burn or was he instrumental in burning the build-

ing? Second, was the building occupied or not? Third, did the defendant misrepresent the value of the building?

Upon the first issue there is not any evidence to the effect that the defendant set fire to the property or caused it to be destroyed. As to the second, the evidence was undisputed. It is clear that the building was occupied. The third issue relates to the value of the property insured. Here the parties had agreed upon the value, and the jury had no right to speculate upon the issue unless the state had proved willful destruction of the property. In the State v. Korth, 39 S. D. 365, 164 N. W. 93, this court reversed the trial court because "the evidence was insufficient to connect the [defendant] with the commission of the offense charged." The proof submitted was "uncertain, weak, and unsatisfactory to such an extent that it should not be held sufficient to produce an abiding conviction of guilt beyond all reasonable doubt of such * * * offense."

The defendant stated in his proof of loss, that the cause of the fire was unknown. The defendant was upon the witness stand and, after a vigorous cross-examination, the cause of the fire is still unknown.

The prosecution proved the burning of the building and then asked the jury to speculate and surmise that the defendant was connected with the loss of the building, in place of assuming that the fire was accidental and occurred without criminal fault.

Section 2555, subd. 2, C. L. 1919, allows a new trial on the misconduct of the jury when the verdict is obtained by chance, as follows:

"By a resort to the determination of chance, such misconduct may be proved by the affidavit of any one of the jurors."

It appears that two jurors, Walters and Aasen, were close and intimate friends. After the submission of the case, these two jurors voted "not guilty." They believed that the defendant was not guilty of the crime charged against him. The case was given to the jury on Saturday afternoon. It appears that the jury first stood six for acquittal and six for conviction. After the jury had spent considerable time in the discussion of the case, these two jurors made up their minds that the jury would never agree. They were anxious to get out. They discussed between themselves what was best to do under the circumstances. Aasen said to Walters:

"What shall we do to get out of here?" Walters replied: "I'll tell you, Ed, what let's do. Let's flip a penny or cut the cards and if you get the high card, we will vote 'guilty,' and if I get the high card, we will vote 'not guilty.'" These two jurors entered into the washroom or toilet, a room 5x8 feet in size. Walters took a deck of cards from his pocket, shuffled them. Aasen cut first and turned up a queen. Walters then cut and turned up a nine spot. Walters then said, "We must go back and vote 'guilty,' according to our agreement." Aasen said, "Yes that is the agreement but I hate to do it." Walters said, "So do I but we have agreed to do it; let's stay by it." When the next ballot was taken, they voted "guilty."

The jury reached a decision about 10 or 10:30 on Saturday evening, April 15th. Immediately thereafter the said Walters went home. He was then making his home with W. H. Walters and Ella J. Walters, his father and mother. In the presence of his mother, father, and sister, Walters said he felt badly because he had been a party to the conviction of Egan; that Egan had not had a fair trial by the jury; that some of the jurors were biased and prejudiced against him. Being asked in what particulars the case was not properly decided, he replied that he and Aasen had voted "not guilty" and had agreed between themselves that they would shuffle the cards and cut them and thus decide which way they should vote; that the verdict was based upon the luck of the high card going to Aasen instead of Walters. The parents then advised the son to go early on the next morning to Mr. Egan and tell him the truth of what took place. The juror Aasen gave testimony of the same general character.

It appears on Sunday morning, after the separation of the jury, that Aasen narrated the facts about the cutting of the cards to William Monarity, who corroborated the affidavit made by Aasen.

While it is true that a number of the jurors stated that they did not see any cutting of the cards nor hear any discussion between these two jurors on the subject of deciding how they should vote, this negative testimony has no probative weight and does not dispute the testimony of these two jurors.

I fail to find any testimony whatever to contradict the statements given by these jurors. They were in no way impeached.

Afterwards they were arrested and a charge of perjury lodged against them, but this charge was dismissed after investigation. I think it must be assumed that these two jurors were telling a true story. It is not probable that Walters, on leaving the jury room, would produce from his pocket the deck of cards that settled Egan's fate and deliberately lie to his mother, father, and sister. I think these affidavits clearly establish the fact that this verdict was reached by the cutting of the cards.

The testimony given by the two jurors is corroborated, so far as Walters is concerned, by the mother, father, and sister and, so far as Aasen is concerned, by Monarity, Louis H. Smith, and John D. Lynch. These affidavits clearly establish the fact that the verdict was reached by the cutting of the cards. These two jurors through thoughtlessness had engaged in a miserable trick to evade their sworn duty. When the fact of a chance verdict is established, the cherished right of the jury trial should not be debauched. The state owes a duty to every citizen to see that he has a fair and impartial trial. The guilt or innocence of a defendant should not be established by the chance of cutting a queen or nine spot.

Note.—Reported in 195 N. W. 642. See, Headnote (1), American Key-Numbered Digest, Criminal law, Key-No. 301, 1149, 16 C. J. J. Secs. 728, 731, 17 C. J. Sec. 3575; (2) Indictment and information, Key-No. 147, 31 C. J. Secs. 405, 400, 404; (3) Criminal law, Key-No. 1167(1), 17 C. J. Secs. 3662, 3618; (4) Insurance, Key-No. 31, False pretenses, 25 C. J. Sec. 55; (5) Indictment and information, Key-No. 71, 31 C. J. Secs. 170, 180; (6) Insurance, Key-No. 31, False pretenses, 25 C. J. Sec. 85; (7) Criminal Law, Key-No. 444, 16 C. J. Sec. 1524; (8) Insurance, Key-No. 31, False pretenses, 25 C. J. Sec. 85; (9) Insurance, Key-No. 31, False pretenses, 25 C. J. Sec. 101; (10) Criminal law, Key-No. 444, 16 C. J. Sec. 1524; (11) Insurance, Key-No. 31, False pretenses, 25 C. J. Secs. 88, 89; (12) Insurance, Key-No. 31, False pretenses, 25 C. J. Secs. 88, 89; (13) Criminal law, Key-No. 371(1), 16 C. J. Secs. 1162, 1136; (14) Criminal law, Key-No. 1038(1), 16 C. J. Sec. 2514, 17 C. J. Secs. 3555, 3556, 3335; (15) Criminal law, Key-No. 720½, 17 C. J. 3638; (16) Criminal law, Key-No. 730(9), 17 C. J. Sec. 3638, 16 C. J. Sec. 2271; (17) Criminal law, Key-No. 957(2), 16 C. J. Sec. 2755.

On liability of insurance company in case of intentional destruction of property by insured, see note in 17 L. R. A. (N. S.) 189.

On effect of false swearing in proofs of loss, see note in 32 L. R. A. (N. S.) 453.

On effect of overvaluation in proof of loss of property insured as fraud avoiding fire insurance policy, see note in 20 A. L. R. 1164.

On Rev. Code 1919, Sec. 4771, see annotations, Kerr's Cyc. Codes, 1920, Pen. Code, Sec. 1004.

On Rev. Code 1919, Sec. 4271, see annotations Kerr's Cyc. Codes, 1920, Pen. Code, Sec. 549.